Slip Op. 14-12

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| JIAXING BROTHER FASTENER CO., LTD., | |
| Plaintiff, | Before: Leo M. Gordon, Judge |
| v. | Court No. 12-00384 |
| UNITED STATES, | |
| Defendant. | |

**OPINION and ORDER**

[Final results of administrative review sustained in part and remanded in part.]

Dated: February 6, 2014

    Gregory S. Menegaz, J. Kevin Horgan, and John J. Kenkel, deKieffer & Horgan of Washington, D.C. for Plaintiffs Jiaxing Brother Fastener Co., Ltd., aka Jiaxing Brother Standard Parts Co., Ltd., IFI & Morgan Ltd., and RMB Fasteners Ltd.

    Jane C. Dempsey, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice of Washington DC for Defendant United States.  With her on the brief were Stuart F. Delery, Assistant Attorney General, Jeanne E. Davidson, Attorney in Charge. Of counsel on the brief was Daniel J. Calhoun, Office of the Chief Counsel, Import Administration, U.S. Department of Commerce of Washington, DC.

    Frederick P. Waite and Kimberly R. Young for Vorys, Sater, Seymour and Pease LLP of Washington, D.C. for Defendant-Intervenor Vulcan Threaded Products Inc.

    Gordon, Judge:  This action involves the second administrative review conducted by the U.S. Department of Commerce ("Commerce" or "Defendant") of the antidumping duty order covering steel threaded rod from the People's Republic of China ("PRC").  See Certain Steel Threaded Rod from the People's Republic of China, 77 Fed. Reg. 67,332 (Dep't of Commerce Nov. 9, 2012) (final results second admin. review) ("Final Results");

see also Issues and Decision Memorandum for Final Results of Second Administrative Review of Certain Steel Threaded Rod from the People's Republic of China, A-570-932 (Dep't of Commerce Nov. 5, 2012), available at http://ia.ita.doc.gov/frn/summary/PRC/2012-27438-1.pdf (last visited Jan. 31, 2014) ("Decision Memorandum").   The court has jurisdiction pursuant to Section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2006),[1] and 28 U.S.C. § 1581(c) (2006).

Before the court is the motion for judgment on the agency record of Jiaxing Brother Fastener Co., Ltd., aka Jiaxing Brother Standard Parts Co., Ltd. ("Jiaxing Brother"), IFI & Morgan Ltd. ("IFI"), and RMB Fasteners Ltd. ("RMB") (collectively "Plaintiffs") challenging Commerce's (1) selection of Thailand as the primary surrogate country, (2) surrogate valuation for steel wire rod and steel round bar, and (3) surrogate valuation for hydrochloric acid.  Pls.' Mem. in Supp. of Mot. for J. on the Agency R. 2-4, ECF No. 25 ("Pls.' Br.").  For the reasons that follow, the court sustains Commerce's rejection of India as the primary surrogate country, but remands the selection of Thailand over the Philippines to Commerce for clarification or reconsideration as may be appropriate.

## I. Standard of Review

For administrative reviews of antidumping duty orders, the U.S. Court of International Trade sustains Commerce's "determinations, findings, or conclusions"

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2006 edition.

unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole.  Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006).  Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  DuPont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966).  Fundamentally, though, "substantial evidence" is best understood as a word formula connoting reasonableness review.  3 Charles H. Koch, Jr., Administrative Law and Practice § 9.24[1] (3d. ed. 2013).  Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record." Edward D. Re, Bernard J. Babb, and Susan M. Koplin, 8 West's Fed. Forms, National Courts § 13342 (2d ed. 2013).

Separately, the two-step framework provided in Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-45 (1984), governs judicial review of Commerce's interpretation of the antidumping statute. See United States v. Eurodif S.A.,

555 U.S. 305, 316 (2009) (Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous.").

## II. Background

On May 27, 2011, Commerce initiated the second administrative review of <u>Certain Steel Threaded Rod from the People's Republic of China</u>, 74 Fed. Reg. 17,154 (Dep't of Commerce Apr. 14, 2009) (antidumping duty order), covering exporters RMB and IFI and their affiliated supplier Jiaxing Brother for the April 1, 2010 through March 31, 2011 period of review.  <u>See</u> <u>Certain Steel Threaded Rod from the People's Republic of China</u>, 77 Fed. Reg. 27,022, 27,022 (Dep't of Commerce May 8, 2012) (prelim. results admin. review) ("<u>Preliminary Results</u>").  As part of that review, Commerce's Import Administration Office of Policy ("OP") issued the following "non-exhaustive" list of potential surrogate countries proximate to the PRC on the basis of per capita gross national income ("GNI") as reported in the World Bank's 2012 World Development Report:

| <u>Country</u> | <u>Per Capita GNI</u> |
|---|---|
| China | $4,260 |
| Philippines | $2,050 |
| Indonesia | $2,580 |
| Ukraine | $3,010 |
| Thailand | $4,210 |
| Peru | $4,710 |
| Colombia | $5,510 |
| South Africa | $6,100 |

Request for Surrogate Country Comments, at Att. I (Dep't of Commerce Nov. 18, 2011), PD 102, Joint App'x at JA-00021 to JA-00022 ("<u>Surrogate Country Memorandum</u>"); <u>see</u>

<u>Certain Steel Threaded Rod from the People's Republic of China</u>, 77 Fed. Reg. 27,022, 27,025 (Dep't of Commerce May 8, 2012) (prelim. results admin. review) ("<u>Preliminary Results</u>").[2]  The OP did not include India, the primary surrogate country used in the investigation, because its per capita GNI was $1,340.

Commerce then evaluated Global Trade Atlas ("GTA") data and determined that the countries on the OP list "can be considered significant producers of comparable merchandise."  <u>Preliminary Results</u>, 77 Fed. Reg. at 27,025.  With respect to reliability and availability of surrogate value data, and responding to Plaintiffs' arguments that India, not Thailand, was the appropriate surrogate country, Commerce stated:

> Petitioner provided data for Thailand from GTA to value certain material inputs, and a financial statement from a Thai producer of comparable merchandise to calculate surrogate financial ratios.  [Plaintiffs] provided GTA data for India, as well as various Indian government, non-governmental organization, and industry publications to value material inputs, energy, and movement expenses.  In addition, [Plaintiffs] submitted Indian financial statements to calculate surrogate financial ratios.  However, the Department has stated that "unless we find that all of the countries determined to be equally economically comparable are not significant producers of comparable merchandise, do not provide a reliable source of publicly available surrogate data or are unsuitable for use for other reasons, we will rely on data from one of these countries." . . . Because the Department finds that one of the countries from the Surrogate Country List [Thailand] meets the selection criteria, . . . the Department is not considering India, a country not included in the OP memorandum, as the primary surrogate country.

<u>Id.</u> (footnote omitted).

Although Plaintiffs lost the preliminary surrogate country selection argument, they continued to press the argument for India in their case brief.  Plaintiffs also supplemented

---

[2]  "PD" refers to a document contained in the public administrative record.

the record with data from the Philippines and argued in the alternative that the Philippine surrogate data was the best available on the administrative record.  Commerce did not agree, concluding that "Thailand offers superior quality of data for valuing the steel wire rod consumed by [Plaintiffs] and offers usable data to value all [factors of production] necessary for the final results."  <u>Decision Memorandum</u> at 12.

**Relevant statutory and regulatory framework**

In an antidumping duty administrative review, Commerce determines whether subject merchandise is being, or is likely to be, sold at less than fair value in the United States by comparing the export price (the price of the goods sold in the United States) and the normal value of the merchandise. 19 U.S.C. §§ 1675(a)(2)(A), 1677b(a).  In the nonmarket economy context, Commerce calculates normal value using data from surrogate countries to value the factors of production.   19 U.S.C. § 1677b(c)(1)(B). Commerce must use the "best available information" in selecting surrogate data from "one or more" surrogate market economy countries.   19 U.S.C. § 1677b(c)(1)(B), (4). The surrogate data must "to the extent possible" be from a market economy country or countries that are (1) "at a level of economic development comparable to that of the nonmarket economy country" and (2) "significant producers of comparable merchandise." 19 U.S.C. § 1677b(c)(4).  Commerce has a stated regulatory preference to "normally . . . value all factors in a single surrogate country."  19 C.F.R. § 351.408(c)(2).

The statute does not define the phrase "level of economic development comparable to that of the nonmarket economy," nor does it require Commerce to use any

particular methodology in determining whether that criterion is satisfied.   To fill this

statutory gap Commerce promulgated 19 C.F.R. § 351.408(b):

> Economic Comparability.  In determining whether a country is at a level of
> economic development comparable to the nonmarket economy under [19
> U.S.C. §1677b(c)(2)(B)]  or  [19 U.S,C, §1677b(c)(4)(A)]  of  the  Act,  the
> Secretary will place primary emphasis on per capita GDP as the measure
> of economic comparability.

19 C.F.R. § 351.408(b) (emphasis in original).   Commerce has since explained that it

"now uses per capita GNI, rather than per capita GDP, because while the two measures

are very similar, per capita GNI is reported across almost all countries by an authoritative

source (the World Bank), and because the Department believes that the per capita GNI

represents the single best measure of a country's level of total income and thus level of

economic development."   Antidumping Methodologies in Proceedings Involving Non-

Market Economy Countries: Surrogate Country Selection and Separate Rates, 72 Fed.

Reg. 13,246, 13,246 n.2 (Dep't of Commerce Mar. 21, 2007) (req. for cmts.).

Commerce has developed a four-step process of "sequential consideration of the

statutory  elements"  to  select  an  appropriate  primary  surrogate  country.     Import

Administration Policy Bulletin 04.1: Non–Market Economy Surrogate Country Selection

Process (Dep't of Commerce Mar. 1, 2004), available at http://enforcement.trade.gov/

policy/bull04-1.html (last visited Jan. 31, 2014) (emphasis added) ("Policy Bulletin 04.1").

Commerce (1) compiles a list of countries at a comparable level of economic development

to the subject nonmarket economy based on per capita GNI, (2) ascertains which of the

listed  countries  produce  comparable  merchandise  to  the  subject  merchandise,

(3) determines which of the listed countries are significant producers of such merchandise,

and (4) evaluates the quality (i.e., reliability and availability) of the data from these countries.  Id.  Although the OP's list is not exhaustive and parties may request that Commerce select a country not on the list, Commerce generally selects a surrogate country from the OP list unless all of the listed countries lack sufficient data.  See id.; see also Decision Memorandum at 4 ("[W]hen selecting a primary surrogate country, the Department will normally look first to the list of countries included in the surrogate country memo . . . .").

### III. Discussion

### A. Commerce's decision to not select India as the primary surrogate country

Plaintiffs argue that Commerce erred by not selecting India as the primary surrogate country.  India, though, had a per capita GNI of $1,340, whereas the PRC had a per capita GNI of $4,260.  Given that disparity, as well as the availability of surrogate value data from two other economically comparable countries, Commerce's decision to not select India appears reasonable; it is difficult to envision how India would have been a reasonable or defensible choice on this administrative record.  See, e.g., Dupont Teijin Films v. United States, 37 CIT ___, ___, 896 F. Supp. 2d 1302, 1306-10 (refusing to sustain Commerce's surrogate selection of India over Thailand given disparities in 2009 per capita GNI data), after remand 37 CIT ___, ___, 931 F. Supp. 2d 1297 (2013); Ad Hoc Shrimp Trade Action Comm. v. United States, 36 CIT ___, ___, 882 F. Supp. 2d 1366, 1374-76 (2012) (refusing to sustain Commerce's selection of India over Thailand given disparities in per capita GNI data), modified on other grounds, 37 CIT ___, 882 F. Supp. 2d 1377, after remand, 37 CIT ___, 925 F. Supp. 2d 1315 (2013).

### 1. Commerce's use of per capita GNI to measure
### the comparable level of economic development is reasonable

Plaintiffs nonetheless argue that Commerce should have selected India as the primary surrogate country.  Plaintiffs first challenge Commerce's use of per capita GNI to identify countries at a comparable "level of economic development," which, according to Plaintiffs, is an unreasonable interpretation of the statute under the second prong of Chevron.   Pls.' Br. at 4-14.   Under the second prong of Chevron, Commerce's "interpretation governs" as long as it is reasonable.   United States v. Eurodif S.A., 555 U.S. 305, 316 (2009); accord Timken Co. v. United States, 354 F.3d 1334, 1342 (Fed. Cir. 2004) ("[A]ny reasonable construction of the statute is a permissible construction." (quoting Torrington v. United States, 82 F.3d 1039, 1044 (Fed. Cir. 1996))).  To determine whether Commerce's interpretation is reasonable, the court may look to the express terms of the provisions Commerce interpreted, the objectives of those provisions, and the objectives of the antidumping scheme as a whole.  Wheatland Tube Co. v. United States, 495 F.3d 1355, 1361 (Fed. Cir. 2007).

As explained above, Commerce obtains its per capita GNI data from "an authoritative source," the World Bank.  72 Fed. Reg. 13,246, 13,246 n.2.  That data has the benefit of being "reported across almost all countries."  Id.  As for the individual per capita GNI measure, Commerce "believes that the per capita GNI represents the single best measure of a country's level of total income and thus level of economic development."  Id.  The particular per capita GNI metric Commerce uses is  "the sum of value added by all resident producers plus any product taxes (less subsidies) not included in the valuation

of output [i.e., GDP] plus net receipts of primary income . . . from abroad," divided by population.   The World Bank, GNI Per Capita, Atlas Method (current US$), http://data.worldbank.org/indicator/NY.GNP.PCAP.CD; see Def.'s Br. at 10 n.3. That is indeed a measure of a country's level of total income.   Commerce's utilization of that otherwise consistent, transparent, and objective metric to identify and compare a country's level of economic development is, in the court's view, a reasonable interpretation of the statute.

Plaintiffs argue that rather than per capita GNI, Commerce should instead consider the "actual industry under review." Pls.' Br. at 8-9. According to Plaintiffs, changes in per capita GNI in India and the PRC have not affected steel prices, and the PRC's steel industry is more comparable to India's than it is to Thailand's. Id. at 8-12. Defendant responds that Plaintiffs' proposed industry-sensitive approach overlooks the first of the statute's two-pronged criteria for surrogate production data – identifying a surrogate country at a "comparable" "level of economic development," 19 U.S.C. § 1677b(c)(4)(A) – and explains that Commerce already analyzes the target industry in subsequent sequential steps of its surrogate country selection process. See Def.'s Br. at 11; Policy Bulletin 04.1.  The court agrees with Defendant that Plaintiffs' industry-sensitive approach only fulfills the statute's second criterion to identify a country that is a "significant producer of comparable merchandise," 19 U.S.C. § 1677b(c)(4)(B), without addressing economic comparability. See Def.'s Br. at 11.

Plaintiffs' approach focuses on certain metrics to deliver a preferred outcome, while ignoring other metrics that undermine that choice. Plaintiffs argue that India is the

"superior" choice and "closer to China across many material factors of economic comparability, including (1) GDP; (2) [GNI]; (3) World Bank 'Doing Business' Report ranking; (4) Unemployment; (5) Investment; (6) Industrial Production Growth Rate; (7) Household Income by Percentage Share." Id. at 8-14.  Plaintiffs, however, omit from their analysis other apparent "material factors of economic comparability" contained on the administrative record that tend to demonstrate greater similarities between the PRC and Thailand than the PRC and India, including per capita GDP, life expectancy, adult literacy, and GDP composition by sector of origin.   Jiaxing India Surrogate Value Submission, Exs. 18-20 (Dep't of Commerce Mar. 2, 2012), PDs 50-54, Joint App'x at JA-000813 to JA-000833 & JA-000871 to JA-000872 ("India Data Submission").  Plaintiffs' industry-sensitive approach therefore leaves open to debate which metrics Commerce should utilize to identify economically comparable countries.  The court wonders how such an approach could possibly be administrable across all NME cases.  Commerce must efficiently identify a primary surrogate country early in the proceeding, and Plaintiffs' approach makes that difficult if not impossible.  Commerce's method, on the other hand, has established a consistent, transparent, and objective measure to determine economic comparability.

Commerce's use of per capita GNI as the measure of economic comparability (as opposed to some other assortment of metrics that account for the specific features of relevant industries in potential surrogate countries) is a reasonable interpretation of the statutory mandate to identify and select a primary surrogate country at a "level of economic development comparable" to the nonmarket economy country.   19 U.S.C.

§ 1677b(c)(4)(A).    Accordingly, the court must defer to Commerce's permissible construction of the statute.

### 2. Section 553 of the Administrative Procedure Act ("APA") does not apply to Commerce's refusal to select India as the primary surrogate country

Plaintiffs also claim that Section 553 of the APA required Commerce to provide notice and comment to interested parties before choosing Thailand as the primary surrogate country in the second administrative review.   According to Plaintiffs the selection of Thailand instead of India represents a "massive change in practice [that] should have been put before the public for notice and comment."  Pl.'s Br. at 22-23.  In addition, Plaintiffs claim that respondents in proceedings before Commerce "could reasonably rely on Indian costs to estimate normal value [for Chinese entities] year after year for 30 years." Id.

Section 553 of the APA requires administrative agencies to provide interested parties with notice and an opportunity to comment on proposed rulemaking.  5 U.S.C. § 553(c).  Rulemaking is the "agency process for formulating, amending, or repealing a rule," and a rule is "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy."  5 U.S.C. § 551(4), (5). These requirements "do[] not apply to antidumping administrative proceedings," which mostly involve fact-based, investigative activities.  GSA, S.r.l. v. United States, 23 CIT 920, 931-32, 77 F. Supp. 2d 1349, 1359 (1999); cf. 19 U.S.C. § 1677c(b) (antidumping investigations are not subject to the APA's notice and comment requirement).

Commerce's surrogate country determination is a fact-based, investigative determination carried out pursuant to existing policies and regulations – not a rulemaking action subject to the APA's notice and comment requirements.  See Foshan Shunde Yongjian Housewares & Hardwares Co. v. United States, 37 CIT ___, ___, 896 F. Supp. 2d 1313, 1323-24 (2013) (APA's notice and comment requirement inapplicable to Commerce's selection of Indonesia rather than India as the surrogate country for the PRC during an administrative review); JTEKT Corp. v. United States, 35 CIT ___, ___, 768 F. Supp. 2d 1333, 1347 (2011) (APA inapplicable to alteration in methodology for identifying similar merchandise despite plaintiffs' inability to anticipate effect of Commerce's methodology on its margins).  In any event, Commerce informed Plaintiffs early in the proceeding of its intent to select Thailand as the surrogate country, and provided ample opportunity for Plaintiffs to respond (which it did).  Surrogate Country Memorandum at 1-2.  See generally India Data Submission (Indian surrogate value data summaries and sources); Jiaxing Brother Surrogate Value Submission, Ex. 2 (Dep't of Commerce June 19, 2012), PDs 70-84 (Philippine surrogate value data summaries and sources) ("Philippines Data Submission").

Having invested substantial effort in locating and analyzing Indian data in past proceedings, Plaintiffs' frustration with Commerce's decision to select Thailand is understandable.  Nevertheless, Commerce altered no policy or regulation by selecting Thailand over India as the primary surrogate country on this administrative record. Plaintiffs' APA argument therefore must fail.

### 3. Commerce reasonably refrained from selecting India as the primary surrogate country

Plaintiffs also argue that Commerce should have selected India as the primary surrogate country because of an alleged primacy of Indian over Thai data.  <u>See</u> Pls.' Br. at 14-20.   India though cannot be a suitable primary surrogate country on this administrative record because it is not economically comparable to the PRC.  <u>See</u> <u>Decision Memorandum</u> at 3-4.  During the administrative review, as an alternative to Indian data, Plaintiffs proffered data from the Philippines, which the OP listed as economically comparable to the PRC.  India therefore could never be a reasonable choice because at least one country, the Philippines, satisfies the statutory criterion of economic comparability, whereas India does not.   Plaintiffs' argument about the qualitative superiority of Indian data compared to Thai data ultimately concentrates on a false choice.  Commerce's only real choice was not between India and Thailand, but between Thailand and the Philippines.   The court now turns to Commerce's analysis, findings, and conclusions about the relative quality and reliability of the Thai and Philippine data sets.

### B. Commerce's selection of Thailand rather than the Philippines as the primary surrogate country is potentially unreasonable

Having rejected India on the basis of economic comparability, Commerce focused its surrogate country analysis on Thailand and the Philippines, the only two economically comparable significant producers of comparable merchandise for which it had any surrogate data.  <u>See</u> <u>Decision Memorandum</u> at 3-12.  When selecting surrogate data to value factors of production, Commerce is guided by a general regulatory preference for publicly available, non-proprietary information.   19 C.F.R. § 351.408(c)(1), (4).  Beyond

that, Commerce generally considers the quality, specificity, and contemporaneity of the available data.  <u>Decision Memorandum</u> at 7.

Commerce explained that it selected Thailand over the Philippines because "Thailand offers superior quality of data for valuing the steel wire rod consumed by [Plaintiffs] and offers usable data to value all [factors of production] necessary for the final results," whereas "the Philippine import statistics for the steel wire rod are less specific" and "the Philippine [data] . . . do not contain values for certain factors, such as diesel or marine insurance, that are necessary to calculate a dumping margin for [Plaintiffs]." <u>Decision Memorandum</u> at 12.  There are a number of problems with these findings that render them potentially unreasonable given the information on the administrative record.

To begin, Commerce's rejection of the Philippines due to its lack of data for "diesel or marine insurance" does not appear to be a valid or relevant reason because Commerce did not use Thai data to value either input.  <u>See</u> <u>Preliminary Results</u>, 77 Fed. Reg. at 27,027 (valuing Plaintiffs' marine insurance using "rates from RJG Consultants," a non-Thai source covering "sea freight from the Far East Region," presumably as applicable to the Philippines as Thailand); Surrogate Value Memorandum at 6 (Dep't of Commerce Apr. 30, 2012), PD 63, Joint App'x at JA-000891 (ignoring Plaintiffs' energy costs in accordance with prior practice "in order to avoid double counting energy costs which have necessarily been captured in the surrogate financial ratios" because the single Thai financial statement on the record did not "identify energy expenses").

In addition, Commerce has an announced criterion of utilizing <u>multiple</u> financial statements when available to eliminate distortions that may arise from using those of a

single producer.  Certain Malleable Iron Pipe Fittings from the People's Republic of China,

70 Fed. Reg. 76,234, 76,237 (Dep't of Commerce Dec. 23, 2005) (prelim. results admin.

review), as modified, 71 Fed. Reg. 37,051 (Dep't of Commerce June 29, 2006) (final

results admin. review); see Dorbest Ltd. v. United States, 604 F.3d 1363, 1368, 1373-75

(Fed. Cir. 2010).  Here, there was one Thai financial statement as opposed to three usable

Philippine financial statements, undermining Commerce's finding that the Thai financial

data were of "similar quality" to the Philippine data.  See Decision Memorandum at 9-12.

More problematical, in a separate, roughly contemporaneous administrative proceeding

covering steel wire garment hangers from the PRC, Commerce rejected use of the very

same Thai financial statement (in favor of Philippine financial statements) because of

"several concerns" with the Thai financial statement's "suitability for calculating surrogate

financial ratios."   Decision Memorandum for Preliminary Results of Antidumping Duty

Administrative Review: Steel Wire Garment Hangers from the People's Republic of China,

A-570-918, at 14-16 (Dep't of Commerce Nov. 8, 2012), available at

http://enforcement.trade.gov/frn/summary/prc/2012-27337-1.pdf (last visited Jan. 31,

2014); see Steel Wire Garment Hangers From the People's Republic of China, 77 Fed.

Reg. 66,952 (Dep't of Commerce Nov. 8, 2012) (prelim. results third admin. review),

unchanged in final results, 78 Fed. Reg. 28,803 (May 16, 2013) (final results third admin.

review).

       Beyond these problems, Commerce's conclusion that Thailand "offers usable data

to value all [factors of production]," does not appear reasonable for the hydrochloric acid

("HCL") input.  Just as a quick clarification and reminder, the statutory standard is not

whether surrogate data is merely "usable", but whether it is the "best available", and

Plaintiffs persuasively challenge the reasonableness of Commerce's selection of the Thai

HCL data.   The only Thai HCL data on the record were average import values, which

Commerce used to price Plaintiffs' HCL at $2.92 per kilogram.  Decision Memorandum at

9.   Plaintiffs argue that this value is "aberrantly high" due to expenses associated with

shipping and importing a hazardous substance like HCL, and that Thai data were not the

best available approximation of the domestic HCL it actually consumed.  Pls. Br. at 26.

Specifically, according to Plaintiffs:

> Review of [Thai import data] data reveals that no country came close to importing the quantities consumed by [Plaintiffs] in a single purchase for any given year in total.  In many instances the country had shipped less than 1000 kg of HCL to Thailand per year reported.  For example, in 2010, Belgium shipped 300 kg and Ukraine shipped 530 kg for the year ending in March.  Even extrapolated out over an entire year, it is clear that many of the shipments were small quantities per shipment, suggesting that this HCL had completely different uses, concentrations, or sizes.  Indeed, taking just Belgium as an example again, it shipped nothing in 2010 and 3552 kg in 2009. Germany and Japan have more sizable annual shipments . . . [that do] not even equal what [Plaintiffs] purchase[] in one delivery.  In short, nothing in [the Thai import data] substantiates the Department's baseless assertion that HCL is now being shipped in commercial quantities.  More to the point, HCL is not shipped to Thailand in quantities that are commercially comparable to a producer of STR.

> Further, regardless of whether the shipments are commercial, the merchandise is still hazardous and expensive to ship internationally, as the Department has repeatedly recognized in the past.  The shipments do not become cheap just because the shipments may be commercial.  Brother sourced from local domestic sources, avoiding the costs and hassles of international shipping and clearing customs with hazardous goods.

Id. at 28-29.

Plaintiffs' argument is more than "mere speculation" as Commerce concluded. See Decision Memorandum at 9.  Although the available Indian data cannot be used to value Plaintiffs' HCL (because India is not economically comparable), it nevertheless may be used to analyze the relative quality of the Thai and Philippine HCL data.  Plaintiffs explain that India imported a similar amount of HCL as Thailand during the period of review, and a margin calculated using Indian import data would yield a surrogate value similar to Thailand at $3.64 per kilogram.  India Data Submission at Ex. 2, JA-000505. By contrast, domestic Indian values reported in "Chemical Weekly," a data source Commerce previously utilized in place of Indian import statistics,[3] list a much lower range of HCL prices: $0.08 to $0.15 per kilogram, according to Plaintiff.  Pls.' Br. at 26.  Infodrive India data shows that Indian HCL imports fluctuate substantially with respect to volume and price, lending credence to Plaintiffs' assertion that import prices differ from domestic prices as a result of the hazardous nature of HCL (and the concomitant costs of handling, shipping, and importing).  Id. at Ex. 6, JA-000565 to JA-000603.  Although there is no similar entry-specific data for Thai imports on the record, the Thai data seem to reveal "significant swings in the average unit values of the HCL" similar to the swings in Indian average unit import values as Plaintiffs claim.  Pls.' Br. at 26 & Ex. 2.  It therefore appears that the only reasonable inference one could draw from the administrative record is that

---

[3] See, e.g., Certain Helical Spring Lock Washers From the People's Republic of China, 73 Fed. Reg. 4175 (Dep't of Commerce Jan. 24, 2008) (final results admin. review) and accompanying Issues and Decision Memorandum (Jan. 15, 2008), available at http://ia.ita.doc.gov/fm/summruyIPRCIE8-1228-1.pdf (last visited Jan. 31, 2014) at Cmt. 4.

the Thai import values are similarly affected, and thus do not reflect domestic Thai HCL prices.  See id.; see also India Data Submission, at Ex. 2, JA-000505 (listing an average import value of $0.81 per kilogram for HCL from Thailand); Philippines Data Submission at Ex. 2, JA-000912 (listing an even lower average import value of 15.81 Philippine pesos per kilogram of HCL from Thailand).

Plaintiffs also placed on the record Philippine import statistics featuring entry of more than ten times as much HCL by volume than both the Thai data and the Indian data. See Philippines Data Submission at Ex. 2, JA-000912 (indicating the Philippines imported 2,818,389 kg of HCL during the POR); Pls.' Br. at Ex. 2 (indicating Thailand imported 275,886 kg of HCL during the POR); India Data Submission at Ex. 2, JA-000505 (indicating India imported 172,000 kg of HCL during the POR).   Commerce even acknowledged that this data "consist[] of a wider range of country AUVs than Thai HCL import data."  Decision Memorandum at 9.  According to Plaintiffs, this data would yield a $0.38 per kilogram surrogate value, Pls.' Reply at 15, a price much closer to the domestic values listed in Chemical Weekly than those Indian and Thai average unit import values reflecting significant fluctuations in entry prices and volumes.   The Philippine import statistics simultaneously appear to undermine the reasonableness of relying on Thai import statistics and offer an apparently better available means of valuing Plaintiffs' HCL input.   At the very least, Plaintiffs' evidentiary arguments amount to more than "mere speculation" with respect to the Thai HCL data as Commerce concluded.  See Decision Memorandum at 9.

Each of the aforementioned issues precludes the court from sustaining Commerce's choice of Thailand over the Philippines as the primary surrogate country. Therefore, the court will remand the matter to Commerce for further explanation and consideration.  On remand, Commerce may wish to consider the following questions: Does Thailand's apparently more specific steel input data outweigh the apparent comparative strengths of the Philippine HCL and financial data (and deficiencies of Thai HCL and financial data)?  See Decision Memorandum at 7, 12.  Rather than the otherwise irrelevant rationale of missing Philippine marine insurance and diesel data, are there other potential deficiencies with the Philippine data that counsel its rejection, such as an apparent absence of values for five packing material inputs that are included in the Thai data?  Compare Surrogate Value Memorandum at Ex. 1, JA-000897 (Thai surrogate value master spreadsheet) with Philippines Data Submission at Ex. 2, JA-000910 (Philippine surrogate value spreadsheet, omitting values for "PE Bag," "Plastic Cap," "Carton," "Paper Tube," and "Staples").  Does Commerce's preference to source all surrogate values from the same surrogate country somehow outweigh the apparent superior quality and availability of the Philippine HCL and financial surrogate data?

### III. Conclusion

Accordingly, it is hereby

**ORDERED** that Commerce's rejection of India as the primary surrogate country is sustained; it is further

**ORDERED** that Commerce's selection of Thailand as the primary surrogate country is remanded for clarification or reconsideration, as appropriate; it is further

**ORDERED** that Commerce shall file its remand results on or before April 8, 2014; it is further

**ORDERED** that, if applicable, the parties shall file a proposed scheduling order with page limits for comments on the remand results no later than seven days after Commerce files its remand results with the court.


                                                        _____/s/ Leo M. Gordon_____
                                                         Judge Leo M. Gordon


Dated:   February 6, 2014
         New York, New York